Argued at Pendleton October 30; reversed December 12, 1939

# LARISON-FREES CHEVROLET CO. *v.* PAYNE

(96 P. (2d) 1067)

In Banc.

*E. R. Ringo,* of La Grande (Burleigh & Burleigh, of La Grande, on the brief), for appellant.

*H. E. Dixon,* of La Grande (H. L. Hess, of La Grande, on the brief), for respondent.

LUSK, J.  This suit was instituted by the plaintiff, Larison-Frees Chevrolet Co., a corporation, a dealer in automobiles and automobile trucks at La Grande, Oregon, to restrain the defendant, James S. Payne, from cashing or negotiating a check or draft for $225 issued by the government of the United States to the defendant, the proceeds of which had been assigned by him to the plaintiff as a portion of the first payment on the purchase price of a used 1934 Chevrolet 1½-ton truck and trailer. The defendant resisted the suit on the ground of breach of warranty and alleged fraudulent

representations inducing the sale. He sought cancellation of the contract of sale and special damages. The circuit court entered a decree for the plaintiff from which this appeal is taken. The issues for consideration arise upon the affirmative allegations of the answer and cross-complaint and the reply.

It appears from the record that the defendant had entered into a contract to deliver to the Civilian Conservation Corps camp at Hilgard, Oregon, 350 cords of wood, part of which was at Minam, a distance of about forty miles, and the remainder at a ranch operated by the defendant known as the N. K. West place, about a mile and a half distant from Hilgard. He purchased the truck and trailer from the plaintiff under a contract of conditional sale. This contract, dated December 19, 1935, stipulates a price of $595 for the truck, $495 for the trailer, $1 for the title, a total cash price of $1091, and a total time price of $1220.96, $491 of which was a down payment represented by two promissory notes secured respectively by mortgages on the wood at the N. K. West place and at Minam, the balance to be paid in monthly installments of $60.08 each. At the same time the parties executed a contract by which the defendant assigned to the plaintiff the proceeds of a certain United States government check for $225, then payable to the plaintiff under his contract for the delivery of wood to the C.C.C. camp at Hilgard. The defendant alleges that he bought the truck and trailer for the purpose of hauling wood under this contract and so informed the plaintiff, whose officers and agents assured him that the truck was in first-class mechanical condition and suitable for that purpose, but that the truck was badly worn and in poor mechanical condition and worthless for that or any other purpose. He

further alleges, that the speedometer on the truck indicated approximately 9,000 miles, which the plaintiff represented to him was the actual mileage that the truck had been driven, whereas in fact, it had been driven approximately 25,000 miles in excess of 9,000 miles; that the plaintiff represented to the defendant that it was the owner of the truck and trailer and would secure him a license therefor and Public Utility Commission plates which would enable him to operate in the hauling of wood upon the highways of Oregon and to complete his contract with the United States government, but that, in fact, the plaintiff did not have good title to the truck and trailer, and was unable and failed to furnish him with a certificate of title as required by law, and failed to secure proper license plates, as a result of which the defendant's operations in the hauling of wood were stopped by officers of the state of Oregon; and, further, that such officers refused to furnish the defendant with proper license plates because he did not have a certificate of title to the truck. He alleges that on discovering the falsity of the representations he returned the truck and trailer to the plaintiff, and that because of his inability to operate the truck he was unable to carry out his contract with the United States government, which cancelled it, to his damage in the sum of $5,000. He also alleges that the acts of the plaintiff were wilful and malicious, and on that account prays for punitive damages in the sum of $5,000.

On the trial the president of the defendant company, Mr. Larison, admitted that he had told the defendant that the truck was in good mechanical condition and was suitable for the purpose of hauling wood under the contract of the defendant with the United

States government, and it was the plaintiff's position that in that particular the truck was as represented. The plaintiff, in its reply, denied that it had represented to the defendant that the reading on the speedometer was correct, aserted that it was the owner of the truck and trailer at the time of the sale to the defendant, and denied that it had made any of the other representations or promises alleged by the defendant in his answer, except that the reply contains this allegation:

"That one of the reasons that said defendant purchased said used truck and trailer was by virtue of the fact that the same contained a 1935 license, and he contended to the plaintiff that he had no money with which to buy a 1935 license, and then later procure a 1936 license."

■ From an examination of the record we are not convinced that the defendant has sustained the burden of proving that the truck was in such poor mechanical condition that it could not be used for the purpose for which he bought it. It would not be profitable to fill the pages of the reports with a discussion of the minutiae of the testimony, which, in the end, extended to an examination of practically all the numerous parts of the truck's motor and running gear. The truck and trailer had been formerly owner by a Mr. and Mrs. Faust, of Ontario, who bought it new from the plaintiff, and were registered in the name of Sophia Faust. After being driven approximately 19,000 miles the vehicles caught fire while hauling a load of hay. The damage done was extensive, one witness testifying that nothing was left of the truck except the radiator, motor, frame and wheels. The vehicles were repaired, or, perhaps it would be more accurate to say, rebuilt by the Cable Chevrolet Co. of Ontario at a cost of $986.88, and the

Fausts thereafter drove the truck an additional 9,000 miles, most of the time hauling heavy loads of wood over the roughest kind of mountain roads, until the truck and trailer were repossessed by the General Motors Acceptance Corporation for failure to make the payments and returned to the plaintiff in the month of December, 1935. Notwithstanding the use which they were thus able to make of it, the Fausts, who testified for the defendant, had little but condemnation for the truck, and Mrs. Faust went so far as to say that it was practically impossible to use it after the fire. Their testimony has the earmarks of bias, perhaps due to the fact that the vehicles had been repossessed.

After the repossession the truck and trailer were reconditioned by the plaintiff at a cost, for labor and parts, of $110.34, and, according to the testimony of the mechanics who did that work, were put in first class running condition. That all traces of the fire had been obliterated is shown by the testimony of these mechanics that they did not know that the vehicles had been through a fire until they heard the testimony on that subject at the trial.

The defendant, Payne, being without experience in the operation of trucks, before completing the deal, had his brother-in-law, William B. Long, an experienced truckman, give it a trial run, after which Payne told Mr. Larison, the president of the plaintiff corporation, that it was satisfactory and that he would take the truck and trailer if the plaintiff would add a new tire and new tubes. This was done, and the papers were signed.

On the 20th of December, the truck, without the trailer, was used to haul a load of wood from Minam. Long drove and the defendant accompanied him, and

they testified that the truck lacked power, the motor heated badly, and they were unable to climb a long, steep grade with the load they were carrying of approximately two or two and a half cords and were compelled to throw out the load. It also developed on this trip that the clutch was not in good order and slipped, and there was a leak in the gasoline tank. They brought the truck back to plaintiff's garage on December 24th, and the clutch pedal was adjusted and the gas tank repaired. The mechanic who did this work testified that the clutch pedal was striking against the floor, and he adjusted it so that it was released. But Long insists, in his testimony, that it continued to slip after that, and he makes a general statement that the truck was not in good mechanical condition and that "you could not drive it and make money hauling wood on it."

It appears, however, from Long's testimony that he made either five or eight trips to Minam with the truck, while the defendant swore that they made six trips—three on the Minam haul and three on the haul from the N. K. West place, carrying, all told, sixteen cords of wood. The defendant, moreover, admitted that he told Mr. Larison that he had hauled four-cord loads out of the Minam. If the wood was green such a load would weigh about eight tons; if dry about six tons. Either would seem to be a heavy burden for a ton and a half truck on a long, steep grade in a high altitude and in bad weather conditions such as the testimony indicates. The road over which the defendant was hauling from the N. K. West place is, under all the testimony, exceedingly rough. For some distance it is the bed of a creek. There are rocks and stumps, narrow places between the rocks where it is difficult to get a

truck through, and, during the time in question, the surface was slippery so that chains had to be used. The conditions were so bad, indeed, that, according to the testimony of Guy Ocheltree, who, in the latter part of December, 1935, had four men with two trucks hauling wood for the defendant from the West place, and of his son, who was engaged in this work, Mr. Ocheltree withdrew from the job. These witnesses appeared to be without bias, and, although they are contradicted by the defendant, we are inclined to accept their testimony.

The defendant returned the truck to the plaintiff on January 9, 1936, and on that day or the next wrote a letter to the plaintiff from Portland, which reads as follows:

"January 9, 1936
Portland, Oregon

"Larison Frees.
Chivorrlett Co.
1414 Adams Ave.
La Grande, Oregon.
Sirs:

Owing to the fact that you failed to get the titel of ownership to the Fowst Truck as required by State Law I waited double the time and could not use the truck when I needed it so will cansel contract. I hired another man to haul the wood so please consider the contract on Fowst truck and trailer canseled.

Very respectiavley
JAMES S. PAYNE
Hilgard, Ore.

P.S. there is a lein on truck which makes me not want it so this contract is canceled."

It will be observed that in the foregoing letter Payne made no complaint about the mechanical condition of the truck, but based his right to cancel the contract

solely on the ground that the plaintiff had failed to "get the title of ownership", and then, by way of postscript, on the supposed existence of a lien against the truck, a complaint which the pleadings do not mention. He testified, however, that he told Larison at the time he returned the truck that it was not satisfactory, and Larison conceded that Payne told him that the truck did not have sufficient power. Larison also testified that on January 8th Payne complained to him that he could not use the truck because he did not have a license, and that he (Larison) told Payne that they could get a license for him if he had the money to pay for it, and that Payne thereupon promised to go to Elgin for the money and come back the next day and procure the license. Payne denied this, claimed that the plaintiff was to furnish the money for the license, and produced a bank ledger sheet containing an account under the name of "Jim Payne, Special" as evidence that he was in ample funds at the time. Wherever the truth may lie on that particular issue, the defendant himself testified that he "went in every day or two to see about the title", and he did not deny that he talked to Larison on January 8th about getting the license,—circumstances which, we think, have their bearing on the genuineness of the claim now under review. If Payne considered the truck mechanically defective and unfit for the purpose for which he bought it, why was he, as late as January 8th, solicitous about securing title and a license to operate it?

If there were no more there might be difficulty in determining the issue from the inspection of a cold record and without the aid to search for the truth which one receives from seeing witnesses and hearing them testify. There are additional facts, however,

which, it seems to us, must turn the scale against the defendant's claim. After the truck and trailer were returned to the plaintiff a small amount of work was done on them. The transmission on the truck was overhauled, the valves ground, and the motor overhauled, at a total cost of $32.40. Sometime in the spring of 1936 the truck was sold to Mr. Fred Miller, who, with his father, W. H. Miller, operates a farm near Elgin. Their testimony shows that they have driven the truck a distance of 15,000 to 17,000 miles in heavy hauling, sometimes over bad roads. Since they have owned the truck it has hauled a thirty Case caterpillar tractor weighing between 10,000 and 11,000 pounds; another engine weighing about 7,000 pounds from Elgin to Athena over the high mountains between La Grande and Pendleton; loads of wheat weighing 10,000 pounds from their own and other farms, the loads being pulled out of the fields onto the highway. At the time of the trial in July, 1938, the truck was being used to haul peas in loose ground, sometimes very steep, the loads weighing around two and one-half tons. The Millers testified in detail concerning the mechanical condition of the truck, and said that it was good and the performance uniformly satisfactory.

These witnesses are evidently persons of standing in their community and are wholly disinterested, and we think their testimony is entitled to weight in resolving the conflicting claims of the parties. We are unwilling to hold that the truck, which gave the Millers such satisfactory service, could have been in bad mechanical condition at the time that the defendant was using it. Viewing the evidence as a whole, we are inclined to the opinion that the real reason why the defendant attempted to cancel his contract was the

trouble he experienced about the title and license, presently to be discussed, and that he has failed to prove this part of his case by that clear and convincing evidence which the law requires when fraud is charged.

■ As to the alleged misrepresentation relative to the mileage indicated by the speedometer, it is a case of Payne's word against Larison's. The plaintiff did not set the speedometer back, and Larison did not know the actual mileage. We think that the defendant has not sustained the burden of proof on this issue.

The defendant claims that the sale was void because the plaintiff failed to comply with the provisions of the Oregon Motor Vehicle Act covering such transfers. The vehicles, as we have stated, had been previously sold to Sophia Faust on contract of conditional sale, which reserved title in the vendor until all payments had been made. The transaction was financed by the General Motors Acceptance Corporation, to which the legal title had been transferred as security, and that corporation was, under the statute, the "legal owner". Oregon Code Supp. 1935, § 55-101, subd. 24. The General Motors Acceptance Corporation also had possession of the certificate of title to the truck, issued by the secretary of state in the name of Sophia Faust and delivered to it as legal owner under the provisions of § 55-201 id. When Sophia Faust defaulted in her contract, the Acceptance Corporation repossessed the vehicles and turned them over to the plaintiff, but did not assign to the plaintiff the certificate of title. Thus, when the sale was made to Payne, it was impossible for either party to comply with § 55-203 id., which contains the following provisions governing the sale of a vehicle for which a certificate of title has been issued:

"* * * The owner shall indorse on the back of said certificate of title an assignment thereof, with warranty of title in form printed thereon with a statement of all encumbrances on said motor vehicle, and the purchaser shall sign said certificate in a space provided thereon, and the transferee and the holder of said certificate of title shall, within 10 days thereafter, present said certificate of title, assigned and signed as aforesaid, to the secretary of state, accompanied by a fee of $1, whereupon a new registration card shall be issued and delivered to the assignee, and a new certificate of title shall be issued to the assignee, and delivered to the legal owner or mortgagee, if there is a legal owner or mortgagee, otherwise to the assignee; provided, that if such purchaser is a licensed dealer, the transferor shall merely indorse said certificate of title, and said licensed dealer shall not be required to present such registration card and certificate of title to the secretary of state, as herein provided, until such time as said motor vehicle or motorcycle has been sold by said licensed dealer; provided, that said licensed dealer immediately shall notify the secretary of state that said motor vehicle has been transferred to him. This provision shall not apply to the transfer of the interest of the legal owner or mortgagee. Upon the sale of said motor vehicle by said licensed dealer, said licensed dealer shall deliver to the transferee the assigned certificate of title received by such dealer, which certificate of title shall be forwarded to the secretary of state, as hereinbefore provided, together with the fee of one dollar ($1), whereupon the secretary of state shall issue a new registration card and deliver the same to said purchaser, and shall issue a new certificate of title in the name of the said purchaser and deliver the same to the legal owner or mortgagee, if there is a legal owner or mortgagee, otherwise to the purchaser."

■ Notwithstanding the failure of the plaintiff to receive the assigned certificate of title and deliver it to the defendant and of the defendant to forward it to

the secretary of state for the purposes stated in the statute, the sale was valid. The decision of *Swank v. Moisan*, 85 Or. 662 (1917), 166 P. 962, relied on by the defendant, was based upon a statute which provided that a sale made without compliance with the provisions of the act would not be valid. That provision was dropped in subsequent legislation, and in its place a penal provision was substituted, as pointed out by Mr. Justice McBride in *Thiering v. Gage*, 132 Or. 92, 103, 284 P. 832; and it was there held that failure to comply with the statute, as it then read, governing the sale of a motor vehicle for which a certificate of title had been issued, did not invalidate the sale as between the immediate parties, although they might be punished for ignoring these provisions. That decision was followed in *Henry v. Condit*, 152 Or. 348, 358, 53 P. (2d) 722, 103 A. L. R. 131, and *Maxwell Co. v. Southern Oregon Gas Corporation*, 158 Or. 168, 172, 74 P. (2d) 594, 75 P. (2d) 9, 114 A. L. R. 697; and, notwithstanding amendments in other particulars, as there has since been no change in the statute evidencing a different legislative intent, it remains the law of this state, and the sale was, therefore, valid.

It remains to consider the defendant's complaint based on his failure to secure a license for the truck and trailer. A brief review of the record on that subject must first be made. As heretofore stated, the defendant alleged in his answer that the plaintiff agreed to secure for him a license for the vehicles and also Public Utility Commission plates. We think the latter claim is not established by the evidence, and will omit further reference to it. The plaintiff denied that it agreed to secure a license for the vehicles, and alleged that they were licensed for the year 1935, and

that the fact that they were so licensed was "one of the reasons that said defendant purchased said used truck and trailer". In truth, as evidence from the office of the secretary of state proved beyond cavil, a license had been issued for the first half of the year 1935 and had expired, and no other license was issued during that year. It is established, therefore, that the plaintiff sold to the defendant a truck and trailer which were not licensed for the second half of the year 1935, notwithstanding its representation to him to the contrary. On his first or second trip with the truck Payne was stopped by the police for driving an unlicensed truck. He immediately informed the plaintiff, whose secretary-treasurer, Mr. Frees, dictated and armed him with a letter, of which the following is a copy:

"December 20, 1935

"To All Traffic Officers:

"We have sold this date to James S. Payne one used 1934 Chevrolet truck and semi-trailer, truck motor No. T 4463240, Serial No. 6PD08-6995, trailer No. 21-3411.

"This truck and trailer was repossessed by us from R. R. Faust, Ontario, Oregon, and the plates were taken off at Ontario.

"We have telephoned Ontario for these plates and will deliver to Mr. Payne immediately on arrival.

"We give him this letter so that he can operate the balance of December and in the meantime we are getting the title transferred so that he can get his 1936 license.

"Yours very truly,

LARISON-FREES CHEVROLET COMPANY.

by

"N. W. Frees-K"

The state police very properly paid no attention to this assumption of authority on the part of Mr.

Frees, and informed Payne that he could not operate the truck without a license. He applied to the sheriff's office at La Grande for a license, but was told he could not get one without a title. After that he stayed off the state highways, and hauled a few loads of wood on a county road. In the meantime Payne, according to his testimony, was at the office of the plaintiff every day or two to ask about the title. On one of these visits he says that Mr. Larison turned to the stenographer or someone and asked if it had come yet, and that the answer was in the negative. He also says that on several of these occasions he saw the salesman and inquired of him about the transfer, and was told by him that the transfer was still in Faust's name. According to Mr. Larison, Payne did not approach him about the license until January 8. He says, in his testimony, that he told Payne at that time that he would get him a license or temporary permit if Payne would bring him the money, and that Payne said he would go to Elgin and get the money, but Payne denies this, says that he had ample funds at the time, and, as proof of that statement, produced the ledger sheet of his bank account showing a balance on January 8, 1936, of nearly $500. On January 9 the plaintiff wrote Payne a letter asking him to call at its office for the title to the truck and trailer. Larison testified that on that day he received a bill of sale to the vehicles, and, he thought, the certificate of registration as well, but was not clear about that. There is no evidence in the record that the plaintiff ever received the certificate of title to the truck.

In the conditional sale contract executed by the parties appears the following under the caption "Customer Needs":

"Application for Title—Later
"Application for License—Later"

Larison testified that the foregoing meant "that we will furnish those papers; that there was a delay in presenting those papers; that there should be a license immediately after special proceedings."

Whatever the minor discrepancies may be in the testimony, the fact remains that for twenty-one days Payne had a truck and trailer purchased from the defendant which he could not drive on the highways of this state because they were not licensed. If this was due to the fault of the plaintiff, Payne was certainly justified in cancelling the contract. He did not buy these vehicles to keep as ornaments, but to use in hauling wood. The plaintiff has sought to shift the blame from its own shoulders to the defendant's. It says that Payne did not sign an application for a license, that he never applied to the plaintiff for the purpose of having it assist him in getting a license until January 8, and, finally, that either he did not have the money with which to buy a license, or was unwilling to use the money for that purpose.

None of these arguments meets the situation that existed prior to January 1, 1936, a period of eleven days when, according to the plaintiff's untrue representation to Payne, the truck was actually licensed. The plaintiff was not only content to make that representation without knowing the facts or making an effort to ascertain them but it repeated the representation after Payne was stopped by the police, and took the unusual course of instructing the police not to enforce the law.

■ If we assume that Payne was under any duty to apply for a license, his testimony is that he did so,

and he is uncontradicted. Doubtless the sheriff to whom the defendant said he applied was available to the plaintiff as a witness, and we think we are warranted in concluding that, if Payne's testimony on this point was false, the plaintiff would have called the sheriff to impeach him.

Payne insists that he was at the plaintiff's place of business every day or two to find out about the title. The title no doubt meant the same thing to him as the license, because he had been informed that he could not get a license without a title. He saw not only Mr. Larison but the salesman, and he saw Frees when Larison was not present. We accept his testimony on this point as true.

Since the representation that the truck and trailer were licensed for the year 1935 was, according to the plaintiff's own statement in its pleading, one of the considerations which induced the defendant to enter into the contract of purchase, it comes with bad grace from the plaintiff to complain that Payne was without funds to buy a license for the remaining portion of that year or was unwilling to spend the money for that purpose.

As to the 1936 license, while we are not prepared to believe that the plaintiff made the unusual agreement asserted to pay for that license with its own money, certainly it was implicit in the contract that Payne should be given such a title or the muniments thereof as would enable him, under the law, to obtain a license from the secretary of state and operate the vehicles on the highways. We turn therefore to the applicable provisions of the Motor Vehicle Act then in effect for the purpose of determining whether the plaintiff in that regard was faithful to its undertaking.

Unless otherwise indicated, all references are to Oregon Code Supp. 1935.

The term "owner" is defined in the law as "any person, firm, association, or corporation having the lawful use or control of any motor vehicle under a contract or a lease or otherwise for a period of ten or more successive days;" and the "legal owner" means "the owner of the legal title to a vehicle".: § 55-101, subds. 23 and 24.

Sec. 55-112 provides that upon application for registration and payment of a certain license fee, the secretary of state shall, in the absence of just cause for refusing to grant a license to the applicant, assign to the applicant a distinctive number, issue to him two number plates, and a registration card, which shall contain the name and address of the registered owner, information relative to the make and model of the motor vehicle with other data, and the number of the certificate of title issued for the motor vehicle.

Sec. 55-102 provides in part:

"Every person, firm, association or corporation having the lawful use or control or the right to use or control under contract or a lease or otherwise for a period of ten (10) or more successive days, of any motor vehicles, trailers or semitrailers, and before he operates the same upon the public highways of this state shall, for each such vehicle owned or controlled, cause to be filed by mail or otherwise in the office of the secretary of state, on a blank or blanks to be furnished by the secretary of state for the purpose, an application for registration, duly signed by said owner, which application shall contain the name and address of the owner and legal owner, a description of the vehicle, including the name of the make, the serial number, the motor number and such other information as may be required by the secretary of state, and which application shall be accompanied by the fee prescribed in this act."

Sec. 55-115 provides:

"No person shall operate or drive a motor vehicle upon the roads, streets or highways of this state unless such vehicle shall have the number plates assigned to it by the secretary of state conspicuously displayed on the front and rear of such vehicle in plain view and so as to easily be read by the public; and it shall be unlawful to display any number which does not entitle the holder thereof to operate such vehicle upon the public highways of this state     *   *   *"

The foregoing is followed by a proviso authorizing officials in certain incorporated cities and towns, to be designated by the secretary of state, to accept applications and fees for the registration of motor vehicles, forward them to the secretary of state, and issue temporary permits for the operation of such motor vehicles pending the receipt of permanent license plates from the secretary of state. In view of one of the plaintiff's contentions it should be observed here that, as far as we have been able to ascertain, this is the only authority in the statute for the issuance of temporary permits.

Sec. 55-208, Oregon Code 1930, provides:

"The owner or any person who shall operate a motor vehicle in this state under a registration number of this state without first securing a certificate of title, as herein provided, shall be guilty of a misdemeanor *   *   *"

Sec. 55-201 reads as follows:

"No registration card of any vehicle or number plates therefor, whether original issues or duplicates, shall be issued or furnished by the secretary of state of the state of Oregon or any other officer charged with such duty, unless the applicant therefor shall at the same time make application for and be granted an official certificate of title of such motor vehicle, or

shall present satisfactory evidence that such a certificate of title covering such motor vehicle has been previously issued to the applicant. Said application shall be upon a blank to be furnished by the secretary of state and shall contain a full description of the motor vehicle, which said description shall contain the manufacturer's number, the motor number, and any distinguishing marks, together with a statement of the applicant's title, and of any liens or encumbrances upon said motor vehicle, and such other information as the secretary of state may require. The secretary of state, if satisfied that the applicant is the owner or legal owner of such motor vehicle or otherwise entitled to have the same registered in his name, shall thereupon issue in the name of the applicant and deliver to the legal owner or mortgagee, if any, otherwise to the applicant, an appropriate certificate of title authenticated by a seal to be procured and used for such purposes; said certificates shall be numbered consecutively, beginning with the number 1, and shall contain such description and other evidence of identification of said motor vehicle as the secretary of state may deem proper, together with the name of the owner and legal owner, and a statement of any liens or encumbrances, which the application may show to be thereon. The certificate issued by the secretary of state, as in this act provided, shall be prima facie evidence of the ownership of such motor vehicle, or of an interest therein. A charge of one dollar ($1) for such original certificate of title so issued shall be made. Said certificate shall be good for the life of the car, so long as the same is owned or held by the legal holder of such certificate, and need not be renewed annually, or at any time, except as herein provided.''

We have previously quoted from § 55-203 governing the sale of a motor vehicle for which a certificate of title has been issued. There is a specific provision governing transfers by operation of law, to wit, § 55-205. By this section it is provided that in the event

of the transfer by operation of law (that expression including repossession upon default in performance of the terms of a lease or executory sales contract) "the certificate of title shall be signed upon the reverse thereof by the executor, administrator, receiver, trustee, sheriff or other representative or successor in interest of the person whose title or interest is so transferred in lieu of such person." It is then required that such representative "shall file with the secretary of state a notice of any transfer by sale, lease or otherwise by him or it, of any such vehicle, together with evidence satisfactory to the secretary of state of all facts entitling such representative to make such transfer, and upon the receipt of satisfactory evidence of such facts by the secretary of state, the secretary of state shall issue a new certificate of title and registration card; provided, that in case of a repossession of a motor vehicle satisfactory evidence must be presented to the secretary of state that the legal owner or mortgagee has given at least 10 days' notice to the owner of said vehicle by registered mail at his last known postoffice address of his intention to apply for certificate of title."

Sec. 55-211 provides for the licensing of dealers in new and used motor vehicles, and contains this provision with respect to secondhand motor vehicles:

"He [the dealer] also shall have in his possession a duly assigned certificate of title from the owner of said motor vehicle from the time when the motor vehicle is delivered to him until it has been disposed of by him."

It is further provided that any person guilty of violating any of the provisions of this section shall be deemed guilty of a felony and punished by a fine of

not more than $500 or by imprisonment for not more than one year or both. Later legislation has ameliorated the harshness of this penal provision by making violation of the act a misdemeanor and reducing the maximum term of imprisonment to six months.

■ In order to aid in the enforcement of the state's criminal laws and to guard against numerous evils that may arise out of the ownership, operation, purchase and sale of motor vehicles, the legislature has enacted a comprehensive statute for their licensing, registration and transfer, and for recording the ownership of such motor vehicles. The statute contemplates that the owner of the vehicle shall secure its registration in his own name by application to the secretary of state, and that registration and number plates shall only be granted to one who either already has or is entitled to have granted to him at the time of his application an official certificate of title, which is made *prima facie* evidence of ownership. It is a violation of law, under these provisions, for one to drive an automobile on the highways of the state without displaying the number plates assigned to the owner of the vehicle, or under a registration number, without first securing a certificate of title. On the sale by a dealer of a motor vehicle for which a certificate of title has been issued, the certificate must be assigned to the purchaser who is required to sign it and present it to the secretary of state within ten days, whereupon a new registration card and new certificate of title are issued to the assignee, the certificate, however, being delivered to the "legal owner" or mortgagee, should there be one. The procedure is outlined for transferring title in case of the repossession of a motor vehicle for the default of the purchaser in a contract

of conditional sale, including a requirement that ten days' notice by registered mail shall be given by the legal owner to the owner of the vehicle before a new certificate of title may be issued by the secretary of state. Finally, there is the requirement, under heavy penalty for failure to observe it, that the dealer have in his possession a duly assigned certificate of title from the owner of the vehicle from the time when the vehicle is delivered to the dealer until it has been disposed of by him.

Under these provisions, in order to place the defendant here in a position where he could have secured a certificate of title, registration card and number plates, the General Motors Acceptance Corporation should have, after giving the requisite ten days' notice to Sophia Faust, presented the signed certificate of title to the secretary of state, secured a new certificate, and assigned it to the plaintiff at the time that the truck was delivered to it; and the plaintiff should immediately have notified the secretary of state of the transfer, and, on the sale of the vehicle, should have delivered to the defendant the assigned certificate of title so that he could have forwarded it to the secretary of state and obtained a new registration card and new certificate of title. So far as the record in this case discloses, none of these requirements of the statute was observed. It does not even appear that the General Motors Acceptance Corporation had obtained a certificate of title.

It is manifest, therefore, that there was no lawful way in which Payne, during any of the time that he was in possession of the truck and trailer, could have secured a certificate of title to the truck, had it registered, or operated it on the highways of this state.

But the plaintiff seeks to excuse itself by evidence of an alleged practice under which, it is claimed, a dealer in automobiles is enabled to obtain a license for a purchaser without following the procedure prescribed in the statute. According to this testimony, when an automobile is sold on conditional sale contract reserving title in the vehicle to secure the balance of the purchase price, and the contract is assigned to a finance company, and the automobile is thereafter repossessed by the finance company for failure of the purchaser to live up to the terms of his contract and is returned to the dealer who sold the car, twenty to thirty days ordinarily elapse before the dealer can secure the certificate of title from the finance company.

In these cases, it is said, the practice has grown up of applying for a license in the name of the former owner, sometimes without, more often with, his consent. Also, there was an arrangement with the sheriff's office under which the purchaser would make the application, the sheriff would issue a temporary permit, and the application would be forwarded to the secretary of state, who would hold it until the certificate of title had been assigned to the purchaser.

No satisfactory reason is suggested for the delay testified to unless it be the statement of one of the plaintiff's witnesses that any balance owing the finance company would have to be paid before it would surrender the certificate of title; but, that apart, there can be no delay which the law recognizes, because the statute requires the dealer to receive the certificate of title at the time that the motor vehicle is delivered to him. The clear purpose of this provision is to prevent just such a situation as was created by the failure of the plaintiff in this case to observe it.

If the truck had been registered and licensed in the name of the former owner and Payne had driven it, he would have been liable to punishment under § 55-208, Oregon Code 1930. The temporary permit that he would have obtained from the sheriff under the alternative method would have been issued without authority of law.

■■ The provision of § 55-115, Oregon Code Supp. 1935, authorizing the issuance of temporary permits, was intended to serve the convenience of the public in those communities where it might be impossible to issue registration cards and number plates at the time application is made, but it does not relax the requirement that the applicant must at the time be entitled to a certificate of title, nor, in any other way than as stated in the section, modify the provisions governing the method of securing new registration and a new certificate of title when a car is sold for which a certificate of title has been previously issued. It is urged, however, as supporting the legality of these procedures, that, since the events with which this litigation is concerned, the secretary of state has issued a printed form entitled "Warranty of Delivery of Oregon Certificate of Title by Registered Oregon Dealer", apparently designed to be used by a dealer in making application for license plates, not on his own behalf, but on behalf of the purchaser of an automobile. The dealer who executes this form agrees to make delivery of the certificate of title covering the vehicle by a certain day, and also agrees to warrant and defend the title in behalf of his successors in ownership of said vehicle, and to defend the secretary of state against all claims to which he may be subjected on account of this transaction. The form states on its face that it may be used

only "in cases which do not involve a transfer of title by operation of law; that is, by inheritance, repossession, foreclosure, etc". As this is a case which does involve a transfer of title by repossession, it would seem that the form is wholly without application here. But, if this is not the correct construction of the quoted language, the administrative interpretation of the secretary of state evidenced by the form is pertinent only insofar as there may be ambiguity in the statute. It will not be contended, we apprehend, that the secretary, of state is at liberty to disregard the law. The first obvious objection to the use of this form is that the application is made by someone other than the owner of the vehicle, a plain violation of § 55-201, Oregon Code Supp. 1935, and the next that it is made on behalf of one who does not have a certificate of title, and, as the warranty given to the secretary of state suggests, may never have one.

The plaintiff calls our attention to the following language in § 55-201, Oregon Code Supp. 1935:

"The secretary of state, if satisfied that the applicant is the owner or legal owner of such motor vehicle *or otherwise entitled to have the same registered in his name,* shall thereupon issue in the name of the applicant and deliver to the legal owner or mortgagee, if any, otherwise to the applicant, an appropriate certificate of title", etc.

It suggests in its brief that the italicized words imply a discretion in the secretary of state to determine whether or not he is satisfied that the applicant is the actual owner of the vehicle registered. In fact, the use of the word "otherwise" would seem to imply that the official might grant registration to one who is *not* an owner or legal owner, a power plainly negatived by other specific provisions. We are unable to deter-

mine what the legislative assembly had in mind when it employed this phrase; whatever it means, it cannot be resorted to in order to sanction methods which are plainly out of harmony with the procedure outlined in the statute.

■ The foregoing analysis of the Motor Vehicle Act makes it abundantly clear, we think, that, owing to the plaintiff's failure to comply with the law, the defendant could not, during any of the time that he was in possession of the truck and trailer, lawfully have obtained registration of them and a license to operate them on the highways of this state. The plaintiff, therefore, failed to perform its contract, and the defendant was justified in returning the property and rescinding the contract. Black on Recession and Cancellation, (2d Ed.) 545, § 196.

■ In *Thiering v. Gage,* supra, Mr. Justice McBRIDE quoted a remark of the trial judge "that he had never tried a case involving the ownership of a motor car in which the parties had not made a mess of it in the course of their transaction", and added "our experience bears him out." This case gives further point to that observation. It may be that the law governing these transactions is too involved and imposes restrictions on dealers in automobiles unduly onerous; it may be, on the other hand, that it is wisely conceived to accomplish the purposes for which it was enacted. It is no part of the court's function to express an opinion as to which of these things is true. On the other hand, a dealer in automobiles must accept the law as he finds it, and obey its commands, even at the cost of inconvenience to himself, and, perhaps, loss of profits. If he fails to do so and is called to account, he must abide the consequences. If change in the law is desirable,

the remedy must be sought at the hands of the legislative assembly.

We do not find in this case that the plaintiff was guilty of any intention to overreach the defendant; we do find that it was careless of the rights of an untutored and inexperienced man, and careless of the law of this state which authorizes it to engage in the business of buying and selling automobiles.

As to the damages claimed by the defendant based on the cancellation of his contract to supply wood to the Civilian Conservation Corps, we are of the opinion that the evidence is too indefinite and unsatisfactory to support a recovery. The amount of the damages is altogether indefinite, the time within which the defendant was required to complete his contract is not shown, and for all that appears he would have lost the contract anyway, for other reasons.

It results that the decree of the circuit court granting the plaintiff the relief sought in its complaint must be reversed, and a decree will be entered here dismissing the suit, the defendant to recover his costs and disbursements. It is so ordered.

RAND, C. J., and ROSSMAN, BELT and BEAN, JJ., concur.

KELLY and BAILEY, JJ., not sitting.